IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WONGA MAQAGI

v.                                              C.A. NO. 13-1573

HORIZON LAMPS, INC;
BALDWIN TECHNOLOGY CO., INC.;
DONNA DAROS; and
BRENDA KUHLE

**<u>MEMORANDUM OPINION</u>**

SCHMEHL, J.    /s/ JLS                                        MAY 26, 2016

Plaintiff, an African-American born in South Africa, brought this action claiming that his
employment was terminated by the defendants because of his disability in violation of the
Americans with Disabilities Act, as amended in the ADA Amendment Act of 2008
("ADAAA"), 42 U.S.C. §§ 12101, *et seq.*, and because of his race and national origin in
violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a, *et seq.* He further
alleged violations of the Family and Medical Leave Act ("FMLA") 29 U.S.C. § 2601, *et seq.* and
added a state law claim under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons.
Stat. §§ 951 *et seq.* against the individual defendants for aiding and abetting. After defendants
filed a motion to dismiss, plaintiff filed an Amended Complaint. (ECF 13.) Defendants
responded by filing a motion to dismiss the Amended Complaint. (ECF 14.)  The parties
subsequently agreed that defendants would waive the motion to dismiss and file an Answer to

1

the Amended Complaint in exchange for plaintiff withdrawing his claims under the FMLA with prejudice. (ECF 17.)  Defendants deposed the plaintiff.

Following a settlement conference with the Court, plaintiff's attorneys filed a motion to withdraw as counsel, citing "a total breakdown in communications and the ability to continue with the representation." (ECF 34.) The Court granted the motion to withdraw and stayed all proceedings for a period of 60 days in order to allow plaintiff time to obtain new counsel. (ECF 45.) After the expiration of the 60 day period, the Court lifted the stay and stated that plaintiff will proceed with this action pro se. (ECF 49.)

Defendants subsequently filed a motion for summary judgment. (ECF 50.)  Plaintiff responded by filing a document entitled "Plaintiff's Objection to Defendants' Motion for Summary Judgment" in which he claimed he was not properly served with defendants' motion for summary judgment. (ECF 51.)  The Court then directed the Clerk of Court to attempt to secure counsel for plaintiff through the Court's Employment Discrimination Attorney Panel. (ECF 53.) After the Clerk was unable to secure counsel for plaintiff after nearly 60 days, the Court overruled plaintiff's "Objection" and directed plaintiff to file a response to the motion for summary judgment. (ECF 55.)

Instead of filing a response, plaintiff filed an appeal from the Court's Order overruling his "Objection." (ECF 56.) The Court of Appeals for the Third Circuit subsequently dismissed the appeal for lack of appellate jurisdiction. (ECF 63.) This Court then again directed plaintiff to file a response to defendants' outstanding motion for summary judgment. (ECF 65.) Plaintiff has now filed a 139-page response with exhibits. (ECF 66.)  For the reasons that follow, the defendants' motion for summary judgment is granted.

## STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

## STATEMENT OF FACTS

The following facts are either undisputed or construed in the light most favorable to the plaintiff: Defendant Horizon Lamps, Inc. ("Horizon") is a wholly owned subsidiary of defendant Baldwin Technology Co., Inc. ("Baldwin"). (ECF 50, Ex. B.)  Baldwin acquired Horizon in June, 2010 from Nordson Corporation. (Id.)  Baldwin serves customers in the printing business and uses Horizon to manufacture and sell infra-red drying and ultraviolet curing technology. (Id.)

Plaintiff was hired by Horizon in 2007 as a telephone sales associate. (Maqagi Dep.117.) As a telephone sales associate, plaintiff was responsible for soliciting new business and maintaining current accounts for defendants via telephone contact. (Id. 96.) At the time plaintiff was hired, defendant Donna Daros ("Daros") was Horizon's office manager and Jeff Bade ("Bade") was its sales manager. (ECF 13 at ¶18.) Bade was also plaintiff's direct supervisor. (Id.) Horizon employed two other telephone sales associates, Jackie Lunger ("Lunger"), a Caucasion and Juanita Candelario ("Candelario"), an Hispanic female.

Plaintiff was first diagnosed with obstructive sleep apnea on December 7, 2008. (ECF 66-1, Ex. P.) The diagnosis was confirmed on January 11, 2010 by Suneel Valla, M.D. of the St. Luke's Hospital Sleep Disorder Center. (Id.) Dr. Valla prescribed sleeping medication and follow-up sleep study with a nasal CPAP (continuous positive airway pressure) mask. (Id.) On that same date, plaintiff sent an email to Bade in which he notified Bade for the first time of his condition and that he planned to make a claim under the FMLA. (Id.)

Plaintiff was permitted intermittent leave under the FMLA from January 2010, through May, 2011. As a result, plaintiff was not disciplined for arriving to work late or for leaving work to attend doctor's appointments.

In a certification to continue plaintiff's leave under the FMLA dated June 7, 2010, Dr. Valla noted that plaintiff's sleep apnea commenced in 2008 and that its probable duration would be lifelong. (ECF 66-1, Ex. H.) He noted that plaintiff experienced "daytime drowsiness." (Id.) Dr. Valla also stated that plaintiff would be unable to perform any job function that required "vigilance." (Id.) Dr. Valla also advised that plaintiff may experience periodic flare-ups of the condition that would occur for one day every six months that could possibly prevent plaintiff

from performing his job functions. (Id.) Finally, Dr. Valla advised that plaintiff "should return for re-evaluation if having flare-ups." (Id.)

Plaintiff's FMLA status was discontinued after Baldwin took over operations of Horizon in May of 2011. Baldwin is apparently not subject to the FMLA and does not extend FMLA to its employees.

Plaintiff testified that he did not believe his sleep apnea interfered with his job responsibilities. (Maqagi Dep., 96-97.)

On March 11, 2011, Bade issued a written warning to plaintiff concerning excessive use of sick time in 2010 and 2011. ( ECF 50, Ex. C.)  The memo stated, *inter alia*,

> As reviewed with you, in calendar 2010 after you had accrued approximately 210 hours of time off (120 hours of paid leave and approximately 90 hours of unpaid time off), we met and discussed your pattern of tardiness and excessive time off from work. At the time of our meeting in December you said that you would address the problem and that 2011 would be a different year.
> Unfortunately, as of week ending March 11, 2011, a review of your year-to-date absenteeism has revealed no notable change from 2010 and in fact reveals an unacceptable pattern. . . .To date you have been absent 83.5 hours or approximately 20% of your scheduled work hours through March 11, 2011. . .

(Id.)

The warning further advised plaintiff that "should your absenteeism not improve and be maintained to a level satisfactory to supervision, the Company will have no other choice but to issue disciplinary action up to and including termination of your employment." (Id.)

On October 19, 2011, Bade issued another written warning to plaintiff concerning excessive absenteeism and warned of possible termination. (Id., Ex. D.) The Memo stated, *inter alia*,

> I met with you in March and we reviewed your pattern of absenteeism which, as of March 11, 2011, revealed that you had used 83.5 of your 152 hours of your paid time off or approximately 55% of your company approved paid time off in a little more than two months into 2011. . . As of Friday October 14, a review of your year-to-date time

off from work has revealed that in addition to not only exhausted all of your company approved paid time off (10 Vacation days, 5 sick days and 16 hours of both Floating Holiday and Personal time), *you have taken an additional 154 hours (19 days) of unpaid and unapproved time off since June 25, 2011.* While you have stated that some of your absenteeism is due to a medical condition, Baldwin is not subject to the Family Medical Leave Act (FMLA) and does not extend FMLA to its employees. **Your unapproved absenteeism since June 25th of 19 days is excessive, and will no longer be tolerated and must cease immediately.**

(Id.) (emphasis in original.)

On January 24, 2012, Bade issued another memorandum to plaintiff, noting that plaintiff had recently arrived late to work without explanation on two occasions. The memo also warned plaintiff that "[c]ontinued failure to report unexplained absences may result in disciplinary action up to and including termination." (ECF 50, Ex. F.)

In October of 2011 and again on August 23, 2012, Candelario, plaintiff's co-worker, received a written warning of excessive use of unapproved absences in 2011 and 2012 and that continued abuse could result in her termination. (ECF 50, Ex. E.)

On July 20, 2012, plaintiff complained to Bade by email that for the past two weeks Daros had been giving him a strange look at closing time each night when she would tell plaintiff "see you in the Morg-ning." (ECF 50, Ex. G.) Plaintiff advised Bade that he did not like to joke about death and that the image of Daros seeing him in the "Morg" was not amusing. (Id.; Maqagi Dep. 219-226.)

On July 23, 2012, Bade met with plaintiff and Daros to investigate plaintiff's complaint. According to Bade's notes, Daros explained that she meant no offense by the comment and that she believed, based on prior conversations, that plaintiff spoke German and would appreciate the phrase since "Morgen" means "morning" in German. (ECF 50, Ex. H.)  Daros told plaintiff she did not mean to offend plaintiff in any manner and apologized. Plaintiff accepted her apology.

(Id.) Bade memorialized the conversation in a email to defendant Brenda Kuhle, ("Kuhle") Baldwin's Human Resources Manager. (Id.)

Kuhle followed up with plaintiff via telephone to address any additional concerns and recommended that plaintiff bring any further complaints directly to her. (ECF 50, Ex. I.) In her notes of the phone conversation, Kuhle noted that plaintiff believed Daros was making jokes at plaintiff's expense and was always negative to plaintiff. Plaintiff responded by sending Kuhle copies of emails which he contended contained complaints about how he was treated by Daros dating back to 2010. (ECF 50, Ex. J.)

Plaintiff testified that Candelario placed a stuffed toy monkey at the edge of her desk facing plaintiff's desk in order to offend plaintiff. (Maqagi  Dep., 170-177.)  Plaintiff admitted that neither Candelario nor anyone else in the office ever attributed the monkey to plaintiff. (Id., 175, 178.) Plaintiff also testified that he never informed Candelario that the monkey offended him. (Id. 176.) Plaintiff also testified that on one occasion, Bade brought a toy motorized monkey into the office which threw a tantrum on the floor after it was turned on by Bade. (Id., 246-247.)

Plaintiff also testified that after he told Lunger he was not going out with his daughter for Halloween, Lunger responded that that was "un-American" and perhaps plaintiff should return to South Africa. (Id.,179.)  Plaintiff testified that he neither reported the comment to his supervisor, nor told Lunger the comment offended him. ( Id., 180-181.)

Plaintiff also testified that Daros, Lunger and Candelario repeatedly told him he did not really suffer from sleep apnea and accused him of just being lazy. (Id., 182-185.) Plaintiff could not recall when these comments were made. Plaintiff did not report these comments to Kuhle. (Id., 184-185.)

Plaintiff testified that on one occasion he and Candelario were putting up Christmas decorations. When Candelario asked plaintiff what she should do with the last piece of garland, Daros interrupted and replied that Candelario should put it around plaintiff's neck. (Id., 215-217.) Plaintiff testified that he construed this comment as a death threat. (Id., 216.) Plaintiff testified that he did not report this comment to anyone, including the police. (Id., 217.)  Plaintiff also testified that at the time he did not really believe anyone was going to string tinsel around his neck. (Id.)

On August 9, 2012, Daros fielded a call from one of plaintiff's customers because plaintiff was not at his desk. (ECF 50, Ex. K.) When Daros later informed plaintiff that she took the order because plaintiff was not at his desk, he disputed Daros' contention in a loud and belligerent manner. (Id)  In an email to Bade, Daros complained that plaintiff "was out to get her" and further stated that "[t]his man is delusional, and I am getting scared he might go off the deep end and try to hurt me." (Id.) When interviewed by Kuhle, Lunger confirmed that plaintiff had been belligerent towards Daros on August 10, 2012, and had acted in a insubordinate manner on another occasion.  (ECF 50, Ex. L.) Lunger also opined that plaintiff is treated differently than other employees in that he "gets by with more unacceptable behaviors (the way he treats others and his absenteeism).( Id.) In addition, when interviewed by Kuhle, Candelario stated that on August 10, 2012, plaintiff had recently responded to Lunger in a loud, angry tone.  (ECF 50, Ex M.)

On August 23, 2012, Kuhle and Bade sent plaintiff a document entitled "LAST CHANCE AGREEMENT." (ECF 50, Ex. N.) The document advised plaintiff that "there have been several issues with your work performance and attendance for more than a year now," including excessive tardiness, failure to notify management when you will be late, failure to

punch in and out for lunch, failure to treat employees respectfully and professionally and failure to treat managerial staff with respect to the point of insubordination. (Id.) The document further detailed a number of conditions that plaintiff would have to meet in order to continue his employment. (Id.) Plaintiff met with Bade and Kuhle on August 23 and 24, 2012 to discuss the terms of the Last Chance Agreement.

In an email dated August 24, 2012, plaintiff memorialized the conversations he had with Kuhle on August 23 and August 24, 2012. Plaintiff stated that Kuhle informed him: 1) she was not aware until today that plaintiff suffered from sleep apnea; 2) that none of plaintiff's medical history on file with Nordson had been transferred to Baldwin;  3) that Bade had never communicated to Kuhle that plaintiff suffered from sleep apnea; and 4) that plaintiff should meet with his sleep specialist to obtain a "diagnosis and prognosis" as soon as possible. (ECF 66, Ex. K.)

In a letter to plaintiff dated September 5, 2012, Kuhle memorialized conversations she had with plaintiff on August 23 and August 24, 2012. (ECF 50, Ex. O.)  Kuhle stated that during these conversations, plaintiff informed her for the first time that he suffered from obstructive sleep apnea. (Id.)  Kuhle also informed plaintiff that the Company "would provide you with the time off you needed to seek medical treatment but that you needed to sign the Last Chance Agreement in order to return to work." (Id.)  Kuhle further noted that plaintiff responded that he "would do whatever except sign the Last Chance Agreement." (Id.) Kuhel notified plaintiff that he was suspended pending the review of the requested medical documentation. Kuhle concluded by stating that "[i]n addition to the prognosis and diagnosis, I will need the doctor to tell us the extent to which the treatment for your condition, or the condition itself, when properly treated,

interferes with your ability to be at work at 8 a.m. or to perform the essential functions of your job." (Id.)

By letter dated September 17, 2012, plaintiff advised Kuhle that Dr. Valla was treating him for sleep apnea. (ECF 50, Ex. Q.)  He also advised that he had informed Baldwin's previous Human Resources Manager, John Lawler, of his need for an accommodation before Lawler left Baldwin. (Id.)

In a letter to plaintiff dated September 21, 2012, Kuhle stated, *inter alia*, that she "**will need to have either the doctor's paperwork by September 27, 2012, or a signed Last Chance Agreement, or we will have considered you to have voluntarily abandoned your position and will proceed to terminate your employment with Baldwin**." (ECF 50, Ex. P.)(emphasis in original.)

On September 27, 2012, Kuhle received a note from Dr. Valla, via facsimile which stated in full that, "[a]bove  patient Wonga Maqagi presented to the Sleep Center on 9/11/12 with multiple complaints and sleep related problems. He will be undergoing testing at this stage. Obstructive sleep apnea is not a disability if it is treated. Usually, if treated, symptoms resolve." (ECF 50, Ex. R.) Dr. Valla did not comment on whether plaintiff's sleep apnea prevented him from arriving to work at 8:00 a.m. or from performing the essential functions of his job.

A sleep study performed on plaintiff on October 5, 2012 at the Sacred Heart Sleep Disorder Center revealed that plaintiff's sleep was "adequate in quality and quantity" and that his "snoring and respiratory events" were eliminated with the use of a nasal CPAP mask. (ECF 66-1, Ex. R.) It does not appear that plaintiff ever forwarded a copy of this sleep study to Kuhle, prior to being terminated.  Rather, plaintiff did not even request a copy of this sleep study until January 8, **2016**. (Id.)

In a letter to plaintiff dated October 11, 2012, Kuhle terminated plaintiff's employment based on his second refusal to sign the Last Chance Agreement and the fact that Dr. Valla's recent note did not contain any need for an accommodation. (ECF 50, Ex. 5.) The letter also advised plaintiff that it had been discovered he had used the company email to send 300 personal emails and to receive sexually explicit emails. (Id.)

## DISCUSSION

### A.     DISCRIMINATION UNDER ADA

The Court first considers plaintiff's claim under the ADAAA. The ADAAA prohibits employment discrimination against "a qualified individual on the basis of disability" with regard to "the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). When analyzing discrimination claims under the ADAAA, courts apply the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Parker v. Verizon Pa., Inc., 309 Fed.App'x. 551, 555 (3d Cir. 2009).

Under the McDonnell Douglas scheme:

(1) plaintiff bears the burden of establishing a prima facie case of discrimination; (2) the burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if defendant meets its burden of production, plaintiff must prove by a preponderance of the evidence that defendant's proffered reason was a pretext for discrimination.

Id. (citing McDonnell Douglas, 411 U.S. at 802.).

To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate (1) he is a disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected

to an adverse decision as a result of discrimination. <u>Turner v. Hershey Chocolate U.S.</u> 440 F.3d 604, 611 (3d Cir. 2006).

To qualify as disabled under the ADAAA, a plaintiff must prove that a physical or mental impairment (1) actually "substantially limits one or more of the major life activities," (2) a record of such impairment, or (3) plaintiff is regarded as having such an impairment." 42 U.S.C. § 12102(1).The statute further defines "major life activities" as including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." <u>Id</u>. § 12102(2)(A)

. In order to be considered a disability, the impairment may not be transitory or minor, and any condition lasting fewer than six months is considered transitory. <u>Id</u>. § 12102(3)(B). In addition, courts must inquire into whether an impairment substantially limits a major life activity "without regard to the ameliorative effects of mitigating measures." 42 U.S.C. § 12102(4)(E)(i). These mitigating measures include "oxygen therapy equipment and supplies," "the use of assistive technology," and "reasonable accommodations or auxiliary aids." <u>Id</u>. § 12101(4)(E)(i)(1).  ).

After the passage of the ADAAA, the definition of disability is not meant to be a demanding standard; rather, "the determination of whether an impairment substantially limits a major life activity requires an individualized assessment." <u>Id</u>. at * 7 (citing 29 C.F.R. § 1630.2(i)(2); § 1630.2(j)(1)(I)). After the enactment of the ADAAA, the Equal Employment Opportunity Commission ("EEOC") revised its regulations, construing the definition of disability "broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.1(c)(4).

The question of whether an individual is substantially limited in performing a major life activity is a question of fact. Williams v. Phila. Hous. Auth. Police Dep't., 380 F.3d 751, 763 (3d Cir. 2004). Finally, the relevant period for making a determination of disability is at the time of the adverse employment decision. Rocco v. Gordon Food Service, 2014 WL 546726, at * 4 (W.D. Pa. Feb. 10, 2014). Therefore, the Court must determine if plaintiff has presented sufficient evidence from which a reasonable jury could infer that plaintiff was substantially limited in his ability to perform a major life activity at the time he was terminated.

Plaintiff claims he is substantially limited in the major life activities of breathing and sleeping.  However, the only medical evidence plaintiff submitted to Kuhle after the August 24, 2012 meeting is Dr. Valla's facsimile from September 27, 2012. That document, however, merely stated that "[a]bove patient Wonga Maqagi presented to the Sleep Center on 9/11/12 with multiple complaints and sleep related problems. He will be undergoing testing at this stage. Obstructive sleep apnea is not a disability if it is treated. Usually, if treated, symptoms resolve." (ECF 50, Ex. R.) Dr. Valla definitely did not state that plaintiff's sleep apnea prevented him from arriving to work at 8:00 a.m. or from performing the essential functions of his job, as required by Kuhle's September 5, 2012 letter to plaintiff.

Nevertheless, because plaintiff is proceeding *pro se* and out of an abundance of caution, the Court will also include the sleep study that was conducted on October 5, 2012 as if it had been presented to Kuhle before plaintiff was terminated on October 11, 2012. (ECF 66-1, Ex. R). That study reveals that plaintiff suffers from "previously confirmed obstructive sleep apnea." (Id.)The study noted that plaintiff is "using CPAP at an empiric setting of 7 cm of water and reports ongoing symptoms that include excessive daytime drowsiness (Epworth Sleepiness Scale is 10/24)." (Id.)  "The study further noted that plaintiff has "restless legs symptoms, uncontrolled

hypertension, nocturia and mood disturbance" and that plaintiff was currently taking the psychotropic medicine Neurontin. (Id.)

Sleep data revealed that "sleep was adequate in quantity and quality" and that "sleep architecture demonstrated a mild reduction in sleep efficiency at 84.1%." (Id.)

Respiratory data indicated that when using a CPAP at an empiric setting of 10 cm of water, "snoring and respiratory events were eliminated." The sturdy recommended continued use of the CPAP at a setting of 10 cm per water. (Id.)

Based on the results of the October 5, 2012 sleep study, the Court finds that plaintiff has presented sufficient evidence from which a reasonable jury could infer that his sleep apnea, when not treated with the mitigating measure of a CPAP nasal mask, substantially limited him from performing the major life activities of breathing and sleeping.

In order to satisfy the second element of a prima facie case of disability discrimination, plaintiff must show that he was qualified for the position, with or without reasonable accommodation. The Court recognizes that plaintiff testified that his sleep apnea neither affected his job responsibilities nor his performance. (Maqagi Dep. 96, 97.)  In fact, plaintiff testified that he was "probably the top sales rep at the facility." (Id., 97.) Furthermore, in his Response to Defendants' Motion for Summary Judgment, plaintiff even states that he has "no problem performing 99% of his job functions. It was the 1% of being to work at 8:00 a.m. that plaintiff struggled with because of Plaintiff's Sleep Apnea disability." (ECF 66, p.81.)

Yet, defendants argue, and plaintiff does not refute, that attendance is an essential function of a telephone sales representative.  The record reveals that in 2010-2012, plaintiff was either absent from work or tardy at an alarming and obviously unacceptable rate. (ECF 50, Exs.C, D, F.) While some of these instances may have resulted from plaintiff's disability, the

14

vast majority are wholly unexplained. No amount of accommodation could have cured these absences. Since attendance is a requirement of almost every job, but particularly for the job of a telephone sales representative who, like plaintiff, is responsible for soliciting new business and maintaining current accounts via telephone contact, the Court finds that plaintiff has presented no evidence from which a reasonable jury could conclude that plaintiff was "qualified" for his job, either with or without reasonable accommodation. Accordingly, plaintiff has failed to satisfy the second element for a prima facie case of disability discrimination.

Even were plaintiff able to make out a prima facie case of disability discrimination, summary judgment would still be appropriate because plaintiff failed to set forth specific facts demonstrating there is a genuine issue for trial as to whether defendants' reason for terminating him was pretextual.

Under the McDonnell-Douglas standard, once plaintiff establishes a prima facie case of disability discrimination, the burden shifts to defendants to proffer a legitimate nondiscriminatory reason for terminating plaintiff. The defendants contend that they terminated plaintiff's employment because of his well-documented excessive absenteeism and insubordination. The Court agrees that the defendants have offered a legitimate, non-discriminatory reason for terminating plaintiff, and concludes that the defendants have met their burden.

The next question, therefore, is whether the defendants' reasons for terminating plaintiff were pretextual. In order to show these reasons are pretextual, plaintiff must point to some evidence from which a reasonable factfinder could either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions. Fuentes v. Perskie, 32 F.3d

759, 764 (3d Cir. 1994).  In other words, a plaintiff must put forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." (Id.) at 765 (citations and internal quotation marks omitted).

Plaintiff has not pointed to any evidence from which a reasonable factfinder could disbelieve the defendants' articulated reasons or believe that an invidious discriminatory reason was more likely than not a motivating factor in their decision to terminate plaintiff.  Evidence of plaintiff's excessive absenteeism and insubordination is well- documented throughout the record. (ECF 50, Exs. C,D,F.) Moreover there is no evidence that Kuhle, the decision-maker, was even aware of plaintiff's sleep apnea at the time she presented plaintiff with the Last Chance Agreement on August 23, 2012. Indeed, the record shows that plaintiff did not submit any medical reports to anyone at Baldwin after June 7, 2010, except for the reports he was prompted to submit by Kuhle. Once plaintiff told Kuhle of his sleep apnea, she provided plaintiff with every opportunity to document how his sleep apnea prevented him from arriving at work at 8:00 a.m. or from performing the essential functions of his job. Neither the September 27, 2012 note from Dr. Valla nor the October 5, 2012 sleep study, assuming arguendo that it was received by Kuhle, demonstrated that plaintiff could not perform the essential functions of his job, either with or without accommodation. (ECF 50, Ex. R; ECF 66-1, Ex. R.)


## B.   FAILURE TO ACCOMMODATE

In Count Two of the Amended Complaint, plaintiff alleges that defendants violated the ADA by failing to accommodate him due to his alleged disability.

A plaintiff can demonstrate that an employer breached a duty to provide reasonable

16

accommodations because it failed to engage in good faith in the interactive process by showing that (1) the employer knew of the plaintiff's disability; (2) the plaintiff requested accommodations for his disability; (3) the employer did not make a good faith effort to assist the plaintiff in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Williams, 380 F.3d  at 772.

As to the first element, the record reveals that plaintiff did not even advise Kuhle, the decision maker, that he suffered from sleep apnea until August 24, 2012. (ECF 66, Ex. K.) There is no evidence that plaintiff requested a specific accommodation from Kuhle on that date. Nevertheless, Kuhle then advised plaintiff that she would need to receive medical documentation to support plaintiff's condition, including the effect the condition had on plaintiff performing the essential conditions of his job and any need for accommodation. The September 27, 2012 facsimile from Dr. Valla merely advised that sleep apnea is not a disability if treated. Dr Valla did not state that plaintiff needed any type of accommodation. Nor did the October 5, 2012 sleep study advise that plaintiff needed any type of accommodation. In fact, the sleep study showed that plaintiff's symptoms were remedied with use of the nasal CPAP at a pressure of 10 cm per water. Therefore, no reasonable jury could find for plaintiff on plaintiff's failure to accommodate claim in Count II.

### C. RETALIATION UNDER ADA

Plaintiff has also asserted a claim for retaliation in violation of the ADA.  In order to establish a prima facie case of retaliation under the ADA, plaintiff must show by a preponderance of the evidence that: (1) he undertook some protected activity; (2) that he suffered an adverse employment action; and (3) that there exists a causal connection between the two. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997). If plaintiff establishes a

prima facie claim, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." <u>Shellenberger v. Summit Bancorp</u>., 318 F. 3d 183, 187 (3d Cir. 2003)(quoting <u>Krouse</u>, 126 F.3d at 500). If the employer successfully meets his burden of production, plaintiff has to show that the otherwise legitimate reasons advance by his employer are actually a pretext to mask a retaliatory animus. <u>See Krouse</u>, 126 F.3d at 501.

Protected activity includes requesting a reasonable accommodation. <u>Shellenberger</u> 318 F.3d at 191. The problem for plaintiff is that he did not inform Kuhle that he suffered from sleep apnea nor request an accommodation from defendants until August 24, 2012, which was <u>after</u> Kuhle had already prepared and presented the Last Chance Agreement to plaintiff on August 23, 2012. By this time plaintiff had already been disciplined numerous times for excessive absenteeism.  Nevertheless, Kuhle allowed plaintiff several weeks to submit documentation to support his condition and need for accommodation. Other than the September 27, 2012 note from Dr. Valla (which did not mention the need for any type of accommodation), plaintiff failed to do so.

In addition, Plaintiff was not discharged until October 11, 2012, nearly two months from the time he first advised Kuhle of his condition. Under these facts, no reasonable jury could find a causal connection between plaintiff informing Kuhle of his sleep apnea and the decision to discharge him nearly two months later.  Rather, the evidence overwhelmingly demonstrates that plaintiff was discharged for his excessive absenteeism and his repeated refusal to sign the Last Chance Agreement.

Although plaintiff argues that his refusal to sign the Last Chance Agreement constituted protected activity, the Court finds that plaintiff's refusal to sign did not constitute protected activity since the Last Chance Agreement did not ask plaintiff to waive any Equal Employment

Opportunity rights or Title VII claims.

**D.      RACE AND NATIONAL ORIGIN DISCRIMINATION UNDER TITLE VII**

Plaintiff has also asserted a claim under Title VII for race and national origin discrimination. The same McDonnell-Douglas burden shifting framework outlined above applies to claims under Title VII as it did to plaintiff's claims under the ADA.

In order to establish a prima facie case of discrimination under Title VII, plaintiff must show that: (1) he is a member of a protected class; (2) he satisfactorily performed the duties required by the position; (3) he suffered an adverse employment action; and (4) either similarly-situated non-members of the protected class were treated more favorably or the adverse job action occurred under circumstances that gave rise to an inference of discrimination.  Sarullo v. U.S. Postal Serv., 352 F. 3d 789, 797 (3d Cir. 2003).

For purposes of the motion for summary judgment, defendants concede the first three elements, but contend plaintiff has not established the fourth element. The Court agrees.

In the first instance, the record reveals that Candelario, a Hispanic co-worker of plaintiff who is not in plaintiff's protected class, also was warned in writing in October of 2011 and again on August 23, 2012, concerning excessive use of unapproved absences in 2011 and 2012 and that continued abuse could result in her termination. (ECF 50, Ex. E).

In the second instance, plaintiff has simply failed to identify any evidence from which a reasonable jury could find that plaintiff's race or national origin played any role in the defendants' decision to issue the Last Chance Agreement or to terminate plaintiff.

**E.      RETALIATION UNDER TITLE VII**

Plaintiff also asserts a claim for retaliation under Title VII. In order to establish a prima facie case of retaliation under Title VII, plaintiff must show that: (1) he engaged in a protected

employee activity; (2) he suffered an adverse employment action either after or contemporaneous with the employee's protected activity; and (3) a causal connection exists between the employee's protected activity and the employer's adverse action. <u>Marra v. Phila. Housing Auth.</u>, 497 F.3d 286, 300 (3d Cir. 2007).

Here, the only protected activity under Title VII that plaintiff could have possibly engaged in was when he complained to Bade about Daros telling plaintiff "See you in the Morging." This claim was thoroughly investigated by defendants and ended up with Daros apologizing and shaking hands with plaintiff. There is no evidence in the record from which a reasonable jury could find any type of causal connection between plaintiff's reporting of this incident and his termination four months later.  Rather, the record is clear that plaintiff was terminated for his excessive absenteeism and his refusal to sign the Last Chance Agreement.

### F.   <u>HOSTILE WORK ENVIRONMENT UNDER TITLE VII</u>

The plaintiff has also asserted a claim for a racially hostile work environment under Title VII. To establish a prima facie case of racial discrimination based on hostile work environment, plaintiff must prove that: (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would negatively affect a reasonable person in the same position; and (5) respondeat superior liability exists. <u>Andrews v. City of Phila.</u>, 895 F. 2d 1469, 1482 (3d Cir. 1990).

Even assuming, *arguendo*, plaintiff has satisfied the first element, in order to prove the second element, plaintiff must show "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." <u>Nat'l R.R</u> <u>Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 (2002) (internal quotation marks omitted). Courts

must consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

Plaintiff does not point to any racially discriminatory comments made by any of the defendants. Nor is there any evidence that anyone took actions that were physically threatening, frequent or that interfered with plaintiff's ability to perform his job.  In addition, plaintiff did not report the majority of alleged incidents to Bade or to Kuhle. The actions plaintiff testified about simply were clearly not severe and pervasive. Nor has plaintiff shown how they had detrimentally affected him in terms of compensation or job title and, most important, plaintiff has not shown how any of these actions would have negatively affected a reasonable person in plaintiff's position. While plaintiff may have had a poor relationship with Daros, a poor working relationship with a supervisor is not enough state a claim for racial harassment. See Walton v. Mental Health Association of Southeastern Pennsylvania, 168 F. 3d  661, 667  (3d Cir. 1999).

One of the incidents plaintiff testified that he did actually raise with Bade is when Daros told plaintiff over a two-week period at closing time that she would see him in the "Morg-ing." Plaintiff construed this comment as a threat that Daros wished him in the morgue and dead. Besides the illogical nature of plaintiff's interpretation, the comment has nothing to do with race and was at best a kind of flippant and stupid remark that cannot give rise to a claim for hostile work environment. In any event Bade immediately investigated the incident and arranged for a meeting with plaintiff and Daros during which Daros apologized for any misunderstanding and plaintiff accepted her apology. Kuhle followed up on the meeting by directing plaintiff to contact

her directly in the future with any other complaints.

A reasonable jury could not find that any of the other incidents when considered individually or together were so severe and pervasive as to alter the conditions of plaintiff's employment. In addition, plaintiff did not report any of these incidents to Human Resources, despite having signed for a copy of Horizon's employment policies which advised an employee to do so. See Faragher 524 U.S. 775 (1998).

Additionally, plaintiff testified that Candelario placed a stuff toy monkey at the edge of her desk facing plaintiff's desk in order to offend plaintiff. Plaintiff also testified, however, that neither Candelario nor anyone else in the office ever attributed the monkey to plaintiff. (Id. , 175, 178) and that he never informed Candelario that the monkey offended him. (Id., 176). These allegations do not amount to an act of hostility.

Also, plaintiff testified that after he told Lunger he was not going out with his daughter for Halloween, Lunger responded that that was un-American and perhaps plaintiff should return to South Africa. (Id., 179).  Again, plaintiff himself testified that he neither reported the comment to Bade, nor told Lunger the comment offended him.( Id., 180-181).

Plaintiff also testified that Daros, Lunger and Candelario repeatedly told him he did not really suffer from sleep apnea and accused him of just being lazy. (Id., 182-185). Plaintiff could not recall when these comments were made. Plaintiff did not report these comments to Bade or Kuhle. (Id. 184-185).

Further, plaintiff testified that on one occasion, he and Candelario were putting up Christmas decorations. When Candelario asked plaintiff what she should do with the last piece of garland, Daros interrupted and replied that Candelario should put it around plaintiff's neck. Plaintiff testified that he construed this comment as a death threat. Plaintiff testified that he did

not report this comment to anyone, including the police. (Id., 217). Plaintiff also testified that at the time he did not really believe anyone was going to string tinsel around his neck. (Id.).

In his Response to defendants' motion for summary judgment, plaintiff raises for the first time additional instances of disparate treatment and hostile work environment. These include that Jim Knoble (Caucasian) was allowed an accommodation for his sleep apnea; that Daros called plaintiff a "nigger"; that defendants caused someone named "Ken Blom" to spy on him; and that defendants manipulated an email by printing out differing time stamps. (ECF 66 at pp. 17, 28, 45, 60, 119-120, 135).

During his deposition, plaintiff was given every opportunity by defense counsel to elaborate on any further claims of discrimination based on disability, race, national origin and hostile work environment that were not alleged in his Complaint. (Maqagi Dep., 278-279). Each time, plaintiff testified that he could not think of anything else at the time. (Id.). Therefore, the Court cannot and will not consider these additional claims of discrimination or hostile work environment.

### G.   AIDING AND ABETTING UNDER PHRA

Finally, defendants Daros and Kuhle are entitled to summary judgment on plaintiff's aiding and abetting claims under the Pennsylvania Human Relations Act because plaintiff has failed to demonstrate the occurrence of any discrimination against him by his employer. One cannot aid and abet that which is not illegal in the first place. See Scott v. Sunoco Logistics Partners, LP, 918 F.Supp. 2d 344 (E.D. Pa. 2013).